Good morning, Your Honors. If it pleases the Court, my name is Lizbeth Caid-Lames, and I represent the petitioner Jesse DeLoso. I apologize if I'm a little bit nervous. This is my first appearance before the Court. That's okay. It's our first one, too. Your Honors, this is an asylum case from the Philippines, which was denied for failure to meet the on-account-off requirement. Also, I'd like to add that the parties in AMICAS, the American Immigration Law Foundation, have also extensively briefed the issues of voluntary departure and summary affirmance. In my presentation today, I will concentrate on the merits of the asylum claim. The immigration judge found that the persecution suffered by Mr. DeLoso, the petitioner, was the result of revenge against his father for working with the police to bring criminals in their area to justice. The petitioner argues that a reasonable fact finder would have been compelled to find that the petitioner suffered past persecution and has a well-founded fear of persecution, at least in part on account of political opinion or membership in a particular social group, the social group being a member of the DeLoso family who actively campaigned for his father and against the MPA. The immigration judge in this case gave no consideration to the possibility of a mixed motive and neither did the Board of Immigration Appeals, since it affirmed the immigration judge's decision without an opinion. When the immigration judge issued his decision in 1997, Borja v. INS had not yet been decided by this court. In Borja, this court recognized the mixed motive theory and granted the petition for review. Petitioner in this case fears persecution from the MPA, a communist group in the Philippines, and the Advincula family, a known supporter of the MPA. The father's activities were such that several people were put in jail, including Mr. Apolino Advincula, who, according to the petitioner and his father, was a known supporter of the MPA. The petitioner's father's acts of cleaning up the drug and criminal activities in their area had the effect of diminishing the financial assistance that the MPA received from those activities. Additionally, the petitioner campaigned for his father. He specifically talked to youth against the MPA and communism and encouraged them to vote democratically for the democratic candidate, which was his father, and against the MPA. The petitioner testified that he spoke to the young people in the city of Bacur on weekends on about 50 occasions. Petitioner was the president of the youth group called Deloso Victory. It is after petitioner's father was elected as a council member to the city of Bacur that the family started to have the problems with the MPA and the Advincula family. The problems consisted of an ambush where a cart was riddled by bullets. The petitioner's father, his brother, and himself were in the cart, but they all survived this attempt. Within the next month after that event, their store, the Deloso store, was ransacked, and a communist emblem, a hammer and a sickle, was put on the premises. Then in June of 1987, the mayor of Bacur, the same city where the petitioner's father was the council member, was assassinated. In August of 97, a letter appeared at the Deloso home, which stated the phrase, You're next, and it contained ten crosses, which the family believed represented the... On the assassination, do we know who committed the killing? Who did the killing? The Delosos believed that it was the communist parties. And the I.J. seemed to have some question about whether that was true or not. Yeah. The I.J. did question certain things, but the I.J. did not make an adverse credibility finding. And the Board of Immigration Appeals also, they just dismissed without an opinion. That was one of our arguments that it should be remanded for that. How soon after the assassination of the mayor were these crosses put on the porch of the family? The mayor was assassinated in June of 1987, and in August, the letter appeared at the Deloso home with the ten crosses. And then, shortly thereafter, there was also something called the Barong Tagalog, which is a burial outfit worn by dead men in the Delosos. They also had a stone and sand on top of it. The Delosos believed that this was additionally a death threat against them. Shortly thereafter, the senior Deloso left the country. The petitioner in this case, the son, he remained there. While he remained in the Philippines, he was attacked on two additional occasions. One time, he was hit by a pipe by a group of men, which he was not able to identify. The second time he was attacked, he was beaten. And he was told by friends that it was people of the Advincula family who had done, who had attacked him. So the petitioner's position is that a reasonable fact finder would have been compelled to find that he suffered persecution, at least in part, on account of political opinion. The act of working alongside the police in putting criminals away, such as drug peddlers, is political by nature. The criminals Mr. Deloso put away were drug peddlers who associated with the New People's Army, a communist rebel group in the Philippines. The petitioner testified that the NPA used drugs as a method of gaining financial support for their group and also as a way of enticing the youth into their organization. Previously... We have examples in this country where, and Al-Qaeda is an example outside the country, where we've had revolutionary groups who have used bank robbery, for example, to finance their operations. If we translate that into the Philippines situation, what weight do we give to the political nature of the criminals when what they're doing is, in fact, criminal activity? Is it automatically political then if they persecute or rough up or kill anybody who gets in their way? For example, let's suppose that on the way to rob a bank they encounter someone they think is going to be a witness, and they either beat them up or they kill them. Does the family of that, let's say he's beaten up so he's alive, he's only, the evidence is pretty clear, he just happened to be in the way, getting in the way of a criminal activity. Does the fact that it's the NPA in that case make it a political persecution even in part? Not in that particular case, Your Honor. But in this case it's different, because there were a series of events. This family, they were very political. The petitioner himself, he would go out and talk to the youth, where he would talk against the NPA. And I think it's very important that many of the, actually all of the incidents described, happened after the senior de loso had been elected to the city council and after the petitioner had done his speeches on the weekends to the youth. What did the NPA do to him? I'm sorry? What did the NPA do to him? There were a series of events, Your Honor. There was an ambush where the father and the petitioner and his brother, their car was shot at. They described it as the car being riddled with bullets. The de loso store was- And how do we know that was the NPA that did that? Just because of the sequence of events, Your Honor. But the next event- So we have to speculate if it was the NPA. In that particular circumstance, I would. In the second incident where the home was ransacked, there was a communist emblem left, a hammer and a sickle, on the premises, which are an indication that it was the New People's Army. What else? The crosses. Remind me on the crosses. Was there any communist symbol associated with that? You mentioned the crosses. Crosses. Oh, the crosses? Mm-hmm. The petitioner only testified that he believed that it was the NPA. But in the Philippines- It wasn't any communist symbol, though. It was more of a threat symbol, symbolizing the number of family members, I think. Right. Usually letters from Tagalos are people in the NPA, they associate it with usually coming- Those are common methods used by the New People's Army. Right. There's no hammer and sickle here. This is crosses? This is the next one. That's another incident, Your Honor. The hammer and sickle was when the store was ransacked. Right. Then there was a separate incident when they said the letter, you're next in the 10 crosses. They did not describe hammer and sickle. So that's not the NPA? We don't know. I ran out of time. Don't worry about that. Oh, I'm sorry? Oh, that's not the NPA? Your Honor, the petitioners, they did believe that all of these incidents were associated with the NPA. Well, how do we credit that if there's nothing else, if there's nothing to suggest that it was the NPA? Because the sequence of events, it's known in the Philippines. Wouldn't you have expected the hammer and sickle to be there if it had been the NPA again? That record does not reflect that. Did I understand you to say, though, that that methodology, the use of crosses was typical of the NPA? Sending letters, those threats. The crosses. I'm just trying to understand if the crosses, whether they have purely speculation or there's anything to link them to the NPA. A method of operation. It's just the petitioners' beliefs. Okay. And there was also a garment or Barong Tagalog. Was the hammer and sickle associated with that? No, Your Honor. All of these things, they were the petitioners' and the fathers' beliefs. They had been working with or against the NPA and the criminal activity in their area, so they were familiar with the methods. So the only concrete incident was the one where the hammer and sickle was left? The rest is just beliefs and sequence of events. That's correct, Your Honor. I want to be sure, because I don't have it right at hand here, but my understanding that there was a hammer and sickle emblem scrawled on the family store when it was ransacked. Right. And that there was a separate incident where there was a hammer and sickle emblem left with the Barong Tagalog. Is that a separate incident or the same incident? I believe the hammer and sickle was only when the store was ransacked, and then there was a stone and sand on top of it, on top of the Barong Tagalog. But not a hammer and sickle? Not a hammer and sickle. Okay. And the stone and sand. Your Honor, would you like me to continue? No, we'll hear from the other side. Thank you. Thank you, Your Honor. If I may please the Court, my name is Jeffrey Bernstein, and I represent the government. As counsel has indicated, they submitted a lot of testimonial evidence with respect to the question of whether Mr. DeLoso's father was persecuted and perhaps whether Mr. DeLoso himself was persecuted. The problem for them was that the immigration judge did not really believe that evidence. The immigration judge concluded, well, they've given a lot of differing evidence, differing testimony about the possible sources of the elder DeLoso's problem. Well, let's separate this out. No one doubted that the incidents occurred. It's just a question of who did it, isn't that right? No, I don't think so, Your Honor. I don't think so at all. I guess there's no doubt that some incidences occurred, but not as to others. Well, what incidents did they challenge? Is it not occurring? Well, the immigration judge did not specifically find that none of the incidents occurred. The immigration judge said, well, the testimony and the evidence offer two separate potential causes. The NPA or the drug lord who was attempting to get revenge against the elder DeLoso's activities, which resulted in the elder crime lord to be placed, to be put in jail. Well, you're agreeing with me that he did not challenge that the incidents happened. It's just who done it? The immigration judge did not go into detail with respect to that. He really made no findings as to whether or not these incidents happened. What he did say is there's lots of conflicting evidence in the evidence provided by the Petitioners, and lots of the conflicting evidence was brought about through leading questions of Mr. DeLoso's counsel. So essentially the judge says, I believe that the most plausible reason for anything that happened to the father was the revenge motivation. Right. But, I mean, the point is you're asking us to say because the IJ expressed some reservations, but not making a finding that the events didn't occur, it comes down to whether it was purely criminal, purely political, or a little bit of both. I mean, what are we supposed to do, look at this record and say, well, because he talked about leading questions and conflicts, but didn't take the trouble to say that he didn't believe the incidents occurred, we should believe they didn't occur at all? Well, the IJ made absolutely no findings as to whether they occurred. Right. So don't we have to assume that they did? I don't think so. And I'm not going to quibble with respect to what incidents happened or not. What the immigration judge essentially did was make an implicit adverse credibility determination with respect to every bit of evidence offered that anything that happened to the elder DeLoso was on account of his political opinion. No, no, was that an adverse credibility finding, or just that he didn't think the evidence was sufficient to reach that conclusion? I think it was an implicit credibility determination because, again, and I'll go over it, the evidence provided by Mr. DeLoso and his father was extraordinarily varying. Initially when Mr. DeLoso, Jr. submitted his asylum application, he blamed everything on the communists and the NPA. And then initially in his father's affidavit, he blamed everything on the NPA and the communists, didn't mention anything about the drug lord. And then Mr. DeLoso, Jr. submits a statement. Let me just back up a second. Mr. DeLoso, Jr.'s asylum application indicated that the communists didn't like him because he participated in the father's campaign and that the father's campaign was strictly on an anti-communist basis. Interestingly enough, there's campaign literature in the record which does not mention anything about the communists. All it says is that if you elect me, I will engage in projects which will help the community. And in fact, in a later declaration, Mr. DeLoso, Sr., stated that his campaign was only mildly associated with anti-communism, that the main thrust of his campaign was anti-crime. In other words, anti-the drug lord and anti-drug use. So as you can see, the applicant's stories, both the stories of him and his father, changed to an incredible degree. At one point they said communists, at the other point they said non-communists. There is also a letter in the record from a commander who submitted in support of the son's application that attributes father's problems with the drug lord, Mr. Advincula's, son's desire for revenge. And again, the only things really that happened to Mr. DeLoso himself was an attack by knife-wielding drug users and an attack, and neither of these attacks were successful, and an attack by people who were identified as Mr. Advincula's sons, which would indicate, which would certainly give credence to the immigration judge's determination that what happened to Mr. DeLoso was on the basis of, at most, an attempt to revenge for the father's getting the drug lord into trouble. What evidence is there of mixed motive? There is no evidence of mixed motive, Your Honor. Oh, no. We've got a hammer and sickle when they solicit. Isn't that a little evidence? No, Your Honor. Let me address that. Again, the immigration judge did not credit that. And it's interesting, and it seems to me implicitly why he didn't credit it, is because in initial applications, this mention of hammer and sickle, there was no mention of hammer and sickle. It was later on during, I believe, testimony, that there was some allegation that a hammer and sickle was left at the house. Again, the allegations, and a review of the record will show this conclusively. The allegations were – were – there were many, many different allegations, and many of the allegations were conflicting, as I've described. Again, Mr. DeLoso, there's no evidence that anything – that even if the family  It was the mother. And I think that the firing on the car occurred, and I think the immigration judge didn't dispute that that happened. He didn't dispute that anything didn't happen. Well, he didn't really address it, as I've said, Your Honor. But in any event, there's no evidence that that shooting was directed at anybody, if anybody. It's the father. And there's no evidence that anybody, the NPA, ever imputed a political opinion, ever imputed Mr. DeLoso Sr.'s political opinion to Mr. DeLoso Jr. Well, DeLoso Jr. campaigned for his father, and he also headed youth groups that were allied with his father's party. Again, that testimony is suspect because, again, he testified that the campaign was based upon anti-communism when the campaign literature doesn't indicate that that is so, and when the father himself said that, I only campaigned lightly on anti-communism, but the main thrust of my campaign was criminal activity. Let me leave this component. I see my time is running out, so I'd like to just point out some additional indicia that cause concern about the bases for Mr. DeLoso Jr.'s asylum claim. Again, his father left the country in 1988 conveniently because his United States citizen son's visa petition for him and his wife was granted. The father has been back to the Philippines on vacation twice in 1996. Despite his allegations that people warned him not to return, he returned twice. Apparently, he said he returned twice because the weather was too cold in the United States. Now, Jesse DeLoso testified that he didn't leave the Philippines with the rest of his family, not because he believed that he was in danger, but because he wanted to stay in the Philippines until he was accepted by the Merchant Marine. And eventually he was accepted by the Merchant Marine. And the point of this is? It indicates... What point are you trying to make? The point is that... Nobody's afraid of anything and nobody was persecuted because of anything. Well, I think that's a bit broad, Your Honor, but it casts doubt upon the credibility of the story that he was persecuted or has a well-founded fear of persecution based upon his political opinion or fear of the NPA. He stayed in the Philippines, apparently, as he testified, because he wanted to wait until he was accepted by the Merchant Marine. Then he was accepted by the Merchant Marine, traveled throughout the world, doesn't apply to Europe, the Middle East and Asia, doesn't apply for asylum anyplace. And he also, one of his statements, one of Jesse's statements, says that after he joined the Merchant Marine, he did not return to the Philippines. In his testimony, he concedes that after he joined the Merchant Marines, he did return to the Philippine Islands twice on vacation. Thank you, counsel. Your time has expired. You can respond. Your Honor. Could you explain what the connection between the Advincula family is and the Communist Party? What's the evidence that they were linked to the Communist Party? It's just the petitioner's and his father's testimony, which, Your Honor, given that the immigration judge did not make an adverse credibility finding, this Court should give it full weight and consider it. Give what full weight? Somebody's unsubstantiated opinion? I mean, things have to compel conclusions up here at our level. Who owns the giants? I think it's the communists. And if they just let that go, I mean, we have to credit that? No, Your Honor. I think the conclusion that has to be compelled is that the problems that the family suffered were at least in part on account of political opinion. I believe that the criminal and the political components are so intertwined that to dissect it in the government's favor doesn't do it justice. He had to prove that it was at least in part on account of political opinion, and there was evidence to compel that conclusion. And lastly, I would just like the Court to mention credibility was not an issue. And if the Court were to deny the petitioner's asylum, then we would request that you would grant him a voluntary departure. Thank you, counsel. This case is ordered and submitted. And we'll move to the last case, Kattenbahn v. Ashcroft.
judges: B. Fletcher,trott, Fisher